John GIPSON, Bill Hefley, M.D., Coolidge Faulkner,
Richard Conder, James Dixon, A.J. Tomme, and Jack Case
*v.* Joe BROWN, Bob Scott, and Tip Nelms, D.D.S.

87-253                                          749 S.W.2d 297

Supreme Court of Arkansas
Opinion delivered May 9, 1988

*Friday, Eldredge & Clark*, by: *William H. Sutton* and *Diane S. Mackey*, for appellants.

*Joe Brown*, Pro Se, *Tip Nelms, D.D.S.*, Pro Se, and *Cliff Jackson, P.A.*, for appellee Bob Scott.

JACK HOLT, JR., Chief Justice. This is the second time we consider whether there is a conflict between the requirements of our code provisions on nonprofit corporations and the tenets of the Sixth and Izard Church of Christ, of which appellees are members and appellants are elders. The dispute concerns appellees' efforts to obtain various financial records of the church by virtue of its status as a nonprofit corporation and to secure an election of directors by the church membership. The elders, with the apparent support of other members within the church, resist appellees' efforts on the grounds that application of our state nonprofit corporation laws would interfere with the religious doctrine and practice of the church in violation of the first and

fourteenth amendments to the United States Constitution and art. 2, §§ 24 and 25 of the Arkansas Constitution.

When the case was first before us, *Gipson* v. *Brown*, 288 Ark. 422, 706 S.W.2d 369 (1986), we granted relief from an interlocutory order of the chancery court compelling discovery of the records and financial information which had been the object of the suit. We remanded to the chancellor with instructions to conduct a hearing to determine whether application of Ark. Code Ann. § 4-28-218 (1987), formerly Ark. Stat. Ann. § 64-1913 (Repl. 1980), would override the religious doctrine, polity or practice of the church as protected by the federal and state constitutions. On remand, the chancellor entered an order appointing a special master "to investigate and [make] findings of fact and conclusions of law over all relevant matters pertaining to this action." The chancellor entered an order adopting the report and recommendations of the master by which the elders were required to conduct an election and "make available . . . all financial and business records of the corporation." From that order comes this appeal.

■ While the chancellor was proceeding beyond his authority when he appointed the special master, and in some cases we have held that this mandates that the appeal be dismissed as premature, *State* v. *Nelson*, 246 Ark. 210, 438 S.W.2d 33 (1969), this court generally reviews matters appealed from chancery court on a *de novo* basis, *Lynch* v. *Brunner*, 294 Ark. 515, 745 S.W.2d 115 (1988). In addition, there is a policy in favor of bringing litigated matters to an end. *Taggart* v. *Moore*, 292 Ark. 168, 729 S.W.2d 7 (1987). On that basis we proceed with the merits of this appeal.

■ In *Gipson I* we stated that it was a close question whether this action could be maintained at all. In view of the record before us, we now conclude that the appeal should be dismissed. The underlying dispute between the elders and the members of the church is essentially religious in nature, and its resolution is more properly reserved to the church. The evidence of record clearly shows that the code provisions governing nonprofit corporations interfere with the doctrine and polity of the church and infringe upon its guaranteed religious liberties — while at the same time the record fails to reveal a compelling state

interest which would justify application of our laws in light of the constitutional proscriptions against interference with the free exercise of religion. In that setting we find that our examination of the issues before us results in the impermissible entanglement of this court in ecclesiastical matters.

## USE OF A SPECIAL MASTER

In *Nelson, supra*, this court's discussion of the appointment of a special master was as follows:

> [T]he chancellor appointed a Special Master, and instructed him to prescribe rules for the expeditious and orderly progress of the tasks with which he was charged, and to proceed with hearing of evidence and ruling *upon all matters of fact and law incident thereto.* . . . In this respect, the trial court was proceeding illegally. . . . *[T]he chancellor* should hear the cause upon the pleadings and such evidence as may enable him to determine the principles to be applied in adjusting the equities of the parties *and then make a reference to a master for such special inquiries or statements of accounts as may aid the court in making a definite decree.* . . . [T]he United States Supreme Court [has] stated that the use of masters was to aid judges in the performance of specific judicial duties as they arise and not to displace the court. [The Court] held that the appointment of a master and a reference at the inception of the case to take evidence and to report the same to the court with his findings of fact and conclusions of law was an action beyond the court's powers. [Emphasis added.]

■ We stated in *Nelson* that to support the reference by reason of anticipation of a lengthy trial, complexity of the issues and congestion of the court's calendar does not constitute sufficient grounds for the virtual displacement of the court by a special master.

> While we can conceive of situations in which a reference of particular matters may be made to a master during the course of litigation, a reference as broad as the one involved here is clearly in excess of the court's jurisdiction and in that respect the court proceeded without authority of law.

*Id.* at 219-220.

■ Rule 53(b) of the Arkansas Rules of Civil Procedure specifies that the reference to a master shall be the exception and not the rule and, except in matters of accounting and difficult computation of damages, the reference shall be made only upon a showing that some exceptional condition requires it. No such showing was made here.

While we reaffirm our position in *Nelson*, the result reached in that case — dismissal of the appeal as "premature" — is not appropriate here in light of our policy in favor of bringing litigated matters to an end and our ability to review matters appealed from chancery court on a *de novo* basis.

## CHURCH VS. STATE

■ One proposition is clear and certain — courts, absent fraud or collusion, do not interfere in purely ecclesiastical matters. As early as *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872), the United States Supreme Court stated that when civil courts get involved in matters of church discipline or ecclesiastical government, it requires looking into the customs, usages, written laws, and the fundamental organization of religious denominations, which deprives these bodies of the right to interpret their own church laws and opens the door to all sorts of evils.

The rule requiring deference to decisions of ecclesiastical bodies on matters of internal church governance is stated in *Gonzales v. Roman Catholic Archbishop*, 280 U.S. 1 (1929), where Justice Brandeis wrote for the majority:

> In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive . . . .

■ In *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), the later in *Jones v. Wolf*, 443 U.S. 595 (1979), the Supreme Court recognized that when religious organizations establish rules for their internal governance, and tribunals for adjudicating disputes over such matters, "the constitution requires that civil courts accept their decisions as binding upon

them." In *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94 (1952), the Supreme Court said that religious freedom encompasses the power of religious bodies:

> [T]o decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

■ In *Gipson I* we emphasized that "internal church disputes relating to the disclosure of church business should not be subject to the legal concern of this court" and that "state courts can only become involved in church disputes when 'neutral principles' of law can be applied to resolve the dispute." Here, the underlying dispute between the appellee members and the elders is of a long-standing, ongoing, heated nature extending beyond application of our code provisions to an explicit attempt by appellees to convince the church membership that they have a biblically based right to access the records of the church and to determine who the elders of the church will be. To achieve this end, incorporation of the church was accomplished through the services of one of the appellees.

■ It does not take much to see that incorporation greatly facilitated appellees' efforts to access church records, while at the same time it had little to do with anything which might implicate state interests or warrant intervention in the dispute under the guise of determining whether our laws on nonprofit corporations apply to the church. As such, and in light of the proscriptions against interference in ecclesiastical matters, interference which is necessarily implicated by the facts and issues before us, we find the appropriate course to be dismissal.

■ That result finds additional support. In *Gipson I* we emphasized that the religious beliefs of all citizens are zealously protected from government interference under both the state and federal constitutions. Article 2, § 24 of the Arkansas Constitution expressly provides that "[a]ll men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences" absent interference with the right of conscience by any human authority. Remand was specifically for the purpose of conducting a hearing on the "claim of first amendment protection versus the disclosure requirements of corporations" because without the benefit of such a hearing we could not "weigh

the sensitive overlap between church and state" presented by the facts of this case. Although considerable testimony was introduced on the doctrine and polity of the church, no evidence was offered as to a compelling state interest which would justify application of our code provisions in the event it was determined that our laws actually infringed upon religious liberties. That fact compounds the extent to which we would be required to delve into the ecclesiastical aspects of the case before us.

The failure to adduce such evidence was apparently due to the conclusion of the special master that application of our laws did not in fact interfere with the doctrine and polity of the church; a conclusion we find unsupported. The appellees' suit was based upon that part of section 4-28-218 which provides: "All books and records of a corporation may be inspected by any member for any proper purpose at any reasonable time." Section 4-28-212 provides: "Each member shall be entitled to one (1) vote in the election of the board of directors." It is with respect to the application of these provisions to the church as a corporation that the elders seek an exemption because, according to the elders, these provisions are in direct conflict with the scriptural duties of the elders as overseers of the flock responsible for harmony within the church.

We find that the record reveals substantial evidence to the effect that the elders' claim of an exemption is in fact tied to established doctrine within the church: (1) the New Testament places within the hands of a select group of elders the sole responsibility for overseeing the affairs of the church and its congregation; (2) the scriptural duty extends to all aspects of administration within the church with the elders being accountable to God for the execution of their responsibility in a manner consistent with the Bible; (3) the scriptural purpose behind the doctrine is the mandate that there be harmony and unity within the flock; and (4) the execution of the responsibility is a matter left to the scripturally guided discretion of the elders as evidenced by biblical admonitions to the flock to obey and submit to them that have rule over the flock. In light of the above, application of our state corporation laws would almost certainly infringe upon the doctrine of the church.

Under those circumstances, we would generally be

required to engage in a balancing process. Our initial inquiry would be strictly limited to whether the disinclination of the elders to comply with certain statutory requirements has at its roots actual religious beliefs in the form of doctrine, polity, or practice of the church. On that issue, our responsibility would be directed not to a determination of what exactly the Bible teaches; rather, we consider whether the evidence supports the conclusion that the elders believe the tenets of the church to be as described and whether those beliefs serve as the basis of appellants' claim to an exemption from the code provisions governing nonprofit corporations. That requirement is satisfied by the facts of this case.

Once that requirement has been met, "it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972); *Sherbert* v. *Verner*, 374 U.S. 398 (1963). Because there is substantial evidence indicating that our laws infringe upon appellants' free exercise of religion, the lack of any evidence on the existence of a compelling state interest mandates the conclusion that, in light of the extent to which the facts before us implicate purely ecclesiastical concerns, the appeal should be dismissed.

In conclusion, we note that the dissent takes refuge under the decision of the Supreme Court of Louisiana in *Bourgeois* v. *Landrum*, 396 So. 2d 1275 (La. 1981), cited in *Gipson I*. That case is simply not controlling as to our decision to dismiss rather than proceed to resolve this church dispute for, as we stated in our former opinion, here the appellant elders "assert the very entanglement in questions of religious doctrine *that the court found absent in the Louisiana cases.*" (Emphasis added.)

Appeal dismissed.

PURTLE, DUDLEY and NEWBERN, JJ., dissent.

JOHN I. PURTLE, Justice, dissenting. This is the second time this case has come before the court. The issues in each case concern the appellees' rights under Arkansas' corporation laws to examine various financial transactions of the church and to

require an election of the board of directors by the church membership. The appellants, elders of the church, rejected these demands and argue that application of the state nonprofit corporation laws interfere with the religious doctrine and practice of the church in violation of the First and Fourteenth Amendments to the United States Constitution and Art. 2, §§ 24 and 25 of the Arkansas Constitution.

When the case was first before us (see *Gipson v. Brown*, 288 Ark. 422, 706 S.W.2d 369 (1986)), we granted relief from an interlocutory order and held that an evidentiary hearing was necessary to determine the merits of appellants' claims of constitutional protection against ordered disclosure of church information. We remanded the case to the chancellor with the specific purpose "to conduct a hearing on the claim of first amendment protection versus the disclosure requirements of corporations."

On remand the chancellor, pursuant to ARCP Rule 53, appointed a master "to investigate and [make] findings of fact and conclusions of law over all relevant matters pertaining to this action." The master conducted six days of evidentiary hearings during which testimony and exhibits were considered.

Upon conclusion of the hearings the master filed his report and submitted his recommendations to the chancellor who adopted the report in toto. Among other things the master recommended:

> 1. That the Defendants be required to answer the Interrogatories and Request for Admissions, except those relating to or concerning the selection of elders.

> 2. That the Defendants be required to conduct an election of the Board of Directors of the Sixth and Izard Church of Christ, Inc., pursuant to Ark. Stat. Ann. § 64-1910 (Ark. Code Ann. § 4-28-211 (1987)).

> 3. That the Defendants be required to make available to plaintiff and intervenors, at a reasonable time during regular office hours, all financial and business records of the corporation as provided in Ark. Stat. Ann. § 64-1913 (Ark. Code Ann. § 4-28-211 (1987)). However, no records concerning selection of elders or contributions of members

or others are to be furnished.

4. That the court reserve jurisdiction of the cause for the entry of such orders as may be necessary to determine and enforce the rights of the parties hereto.

The majority has now done an "about face" and evaded the basic issue before us. Hereafter, a nonprofit corporation may decide it does not agree with the laws under which it is incorporated and simply refuse to abide by the law under the pretext of "religious freedom."

The parties to the litigation are all members of the Sixth and Izard Church of Christ, Inc., located in Little Rock, Arkansas. The church was originally organized as an unincorporated association and operated as such until April 14, 1975, at which time it incorporated under Ark. Stat. Ann. § 64-1905 (Ark. Code Ann. § 4-28-205 (1987)) as a nonprofit corporation. The appellants are presently serving as elders of the church and as members of the board of directors of the corporation. I have no interest in the church-related responsibilities of the elders. However, the responsibilities of the elders in their capacity as members of the board of directors of a corporation created and organized pursuant to the laws of this state is quite a different matter. Had the church not chosen the elders to also serve as directors we likely would not have this problem before us.

The appellees, as members of both the nonprofit corporation and the church congregation, have repeatedly demanded access to the church financial records and election of the board of directors by the church membership. These demands arise out of allegations of discrepancies and inconsistencies in church financial records kept by the elders. The elders have consistently refused to render a full accounting to the appellees setting forth in detail the purposes for which church funds have been expended.

The appellees rely upon the provisions of the nonprofit corporation law which provide that the members of the corporation have the right to inspect the financial records of the corporation. The appellants maintain that the tenets of the Church of Christ religion place authority for church administration solely in the hands of the elders, and therefore the elders cannot be required to share any of this information with the

appellees. In support of this view the appellants argue that it is the longstanding religious belief, polity and practice of the church that the elders have the absolute and final authority over all church matters, including all financial matters.

In *Gipson I*, we emphasized, and I re-emphasize now, that the religious beliefs of all citizens are zealously protected from governmental interference under both the state and federal constitutions. The Arkansas Constitution recognizes that its people have a natural and indefeasible right to worship God according to the dictates of their own consciences and that no human authority can control or interfere with the right of conscience or give preference by law to any religious establishment or mode of worship. The church voluntarily incorporated itself under the secular laws. When the church decided to incorporate, it submitted itself to certain state laws governing corporations, thus opening the door to examination in a legal setting of the dispute within the church concerning adherence to those state laws.

There is no doubt as to the power of the state of Arkansas to impose reasonable laws and regulations governing the operations of corporations within this state. Corporations are entities controlled by the board of directors and officers and are owned by the stockholders and members. The stockholders and members of a corporation are usually so far withdrawn from the everyday business affairs of the corporation that it is impossible for them to have knowledge of the management and finances of the corporation. The Arkansas legislature has wisely provided stockholders and members the right to inspect corporate books and records upon request, at a reasonable time, provided there is a valid reason for such a request. After all, the owners of a corporation are obviously entitled to know what their employees are doing with their money.

Under the circumstances of this case, the Constitution requires a balancing process. If the statute impinges on fundamental rights that are specifically protected by the Free Exercise Clause of the First Amendment, the statute does not control. The state's authority to impose reasonable laws and regulations upon corporations is sufficient to uphold the rights of the appellees in this case. No one can seriously argue that the Arkansas statute at

issue here was in any manner intended to regulate, control or influence the religious belief or practice of any person.

The United States Supreme Court has decided a line of cases recognizing that under some circumstances civil court review of ecclesiastical actions is appropriate. See *Gonzalez* v. *Archbishop*, 280 U.S. 1 (1929): the claim of right to be appointed to a vacant collative chaplaincy and the right to receive the accrued income during the vacancy; *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94 (1952): the right to the use and occupancy of church property where a state legislature had transferred control of church property from one rival group of members to another; *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972): a state's interest in imposing reasonable regulations for the control of basic education; *Presbyterian Church* v. *Hull Church*, 393 U.S. 440 (1969): a state court's interest in resolving disputes over church property; *The Serbian Eastern Orthodox Diocese for the United States of America and Canada, et al.* v. *Milivojivich*, 426 U.S. 696 (1976): a dispute over the control of the property and assets of the Serbian Eastern Orthodox Diocese for the United States of America and Canada.

The Louisiana Supreme Court, in *Bourgeois* v. *Landrum*, 393 So. 2d 1275 (1981), addressed the issue of whether church members have a right to examine the financial books and records of the church under the provisions of the Louisiana nonprofit corporation law. The church had organized pursuant to the state's nonprofit corporation laws. The court, holding that the church members had such a right, observed: "the underlying First Amendment principles, which protect against the entanglement of civil courts in questions of religious doctrine, polity or practice, are not offended by the judicial enforcement of a statute requiring a church, as a non-profit corporation, to keep at its registered office, corporate records for examination by its voting members."

The Louisiana Supreme Court, quoting from *Presbyterian Church* v. *Hull Church*, 393 U.S. 40 (1976), observed:

> First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such contro-

versies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. The First Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.

The Louisiana Supreme Court held that "First Amendment values are plainly not jeopardized by a civil court's enforcement of a voting member's right to examine these records."

Prior to incorporating on April 14, 1975, the Sixth and Izard Church of Christ had, as is traditional with churches in Arkansas, operated as an unincorporated association. The church designated the elders as the first board of directors. They are to hold office until their successors have been elected and qualified. The elders are serving as elders of the church and directors of the corporation at the same time. The duties of the board of directors of a corporation are prescribed by statute. However as elders of the church their responsibilities and duties are purely ecclesiastical in nature. The issue in the present case is almost identical with the issue considered by the Louisiana court in the *Bourgeois* case. I believe that the First Amendment permits civil courts to decide church disputes involving secular matters without resolving the underlying controversies over religious doctrine.

I find no interference by the state in any religious matters by permitting the voluntary incorporation of groups or associations in the manner utilized by this church. The statute providing for incorporation is completely void of any reference to religion. The members of the Sixth and Izard Church of Christ voluntarily incorporated pursuant to this statute. Their purpose in doing so is of no concern to this court. The state did not in any manner attempt to control or influence the religious beliefs of the people of the state of Arkansas. Neither did the state encourage the church to abandon its cloak of nondisclosure and voluntarily incorporate.

It is my opinion that the chancellor acted within the bounds of our mandate in appointing a master and adopting the master's findings of fact and recommendations. For clarification I note that the chancellor's order does not require the appellants to respond to interrogatories and requests for admissions relating to

the selection of elders; nor does it require them to furnish records concerning contributions of members or others. I find nothing in this decree that would interfere with the First Amendment rights of the appellants. I think our first decision in this case was correct and we ought to abide by it.

I would affirm the decision of the trial court requiring the appellants to follow the mandates of the law and our prior opinion in this case.

DUDLEY and NEWBERN, JJ., join in this dissent.